1

2

3

4

5

6

7

8                    **IN THE UNITED STATES DISTRICT COURT**

9                 **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11    ALBERT A. CRESPO,                        No. CIV S-09-0217-CMK-P

12                    Petitioner,

13          vs.                                MEMORANDUM OPINION AND ORDER

14    MICHAEL MARTEL,

15                    Respondent.

16    _____/

17                    Petitioner, a state prisoner proceeding pro se, brings this petition for a writ of

18    habeas corpus pursuant to 28 U.S.C. § 2254.  Pursuant to the written consent of all parties, this

19    case is before the undersigned as the presiding judge for all purposes, including entry of final

20    judgment.  See 28 U.S.C. § 636(c).  Pending before the court are petitioner's petition for a writ of

21    habeas corpus (Doc. 1), respondent's answer (Doc. 9), and petitioner's reply (Doc. 11).

22    / / /

23    / / /

24    / / /

25    / / /

26    / / /

# I. BACKGROUND

A.    __Facts__[1]

The state court recited the following facts, and petitioner has not offered any clear and convincing evidence to rebut the presumption that these facts are correct:

> The victim had known defendant for many years and they dated for about three years and had been engaged for perhaps two years. By September 2002 the relationship had turned sour and they argued regularly. Although she told him she wanted to end the relationship "He did not want the relationship to end and was very adamant about the fact that he wasn't going anywhere."
>
> On about September 1 and 19, 2002, he was violent with her, pushing or pulling her and grabbing her by the throat each time, and she filed for a restraining order against him on about "September 21, 2002. At about 3 a.m. on September 23, 2002, she woke up to find defendant standing over her bed.
>
> The victim was scared but got up and spoke with defendant. He told her to go into the shower. Then he became angry and grabbed her arm: "I kept telling him I didn't want to go take a shower. I was tired, and I wanted to go to bed. We started walking back towards the bathroom. He . . . pushed me against the wall and told me: Don't make any noise. Don't wake everyone up, or he would fuck everybody up in the house." He was angry and she was angry and afraid. "It wasn't like he was dragging me down the hall. He had hold of me, and I was reluctant in going with him." Later she testified, "It wasn't a kicking, screaming fit, but I wasn't saying, 'Yeah. Sure. Come. Let's go,' either."
>
> When they entered the bathroom she asked him to leave the door open but he shut and locked it. She reluctantly got into the shower because "he wouldn't let me not." He told her "to suck his dick" while he had his hand on her head with a handful of her hair which he held tightly, pushing her head down: although she told him she did not want to, she eventually did as he ordered. She relented "Because I just wanted him to go away. Q. And after you did that, what happened next? A. Then I stopped, and I stood up, and he put my leg on the side of the tub and start[ed] performing oral sex on me, and he stopped. Q. And when you say he performed oral sex on you, was that your request? A. No. Q. And is that something that you wanted at that time? A. No."
>
> The victim was afraid defendant was going to hit her and she fled from the bathroom and pounded on a roommate's door. When the household awoke defendant pretended that he did not know what was happening. As defendant tried to pull a blanket off the victim (who was

---

[1]    Pursuant to 28 U.S.C. § 2254(e)(1), ". . . a determination of a factual issue made by a State court shall be presumed to be correct." Petitioner bears the burden of rebutting this presumption by clear and convincing evidence. <u>See id.</u> These facts are, therefore, drawn from the state court's opinion(s), lodged in this court. Petitioner may also be referred to as "defendant."

otherwise still naked), they struggled and he "started hitting me on my face and picked me up by my hair." Defendant said she was going with him. She saw that he had a steak knife, with which he "barely cut" her shoulder.

Eventually the couple left the apartment. At one point away from the apartment defendant "said that he had dug a ditch out there that he was taking me out to put me in," and at another he punched her so hard her vision was blurred for several minutes. The victim thought defendant was "coming down" off of drugs and she had intercourse with him in the back of their truck to help him go to sleep; she viewed this as entirely consensual and so did not mention it during early interviews. When he fell asleep she fled to nearby Grant High School to get help. According to officers who saw her, she was shaking and "very scared" and had visible injuries. When defendant was captured he was asleep near the knife.

A school police officer testified as follows: "Q. When you were speaking with [victim], did she tell you that the defendant made her perform oral sex on him? A. Yes." Another officer testified as follows: "Q. [W]hen you were speaking with the victim and she was recalling to you what had happened to her, did she tell you whether or not the defendant made her give him oral sex? A. Yes. Q. And what specifically did she say? A. She said that happened when he was in the apartment where she lives, and that he forced her into the shower and that he forced her to have oral sex on him." Although defendant objected to these passages, his objections were impliedly overruled.

The victim told an investigator there had been no threats during oral sex, but there had been before; she told defendant "no" and he grabbed her hair and held her head down. She told an investigator "the same thing I just told this court, [which] was that I went in there. He was coercing me in there. It wasn't – like I said before, we weren't holding hands as we tra-la-laed into the bathroom. But I didn't put up a screaming fight either." She testified that as to getting into the shower, to say he "heavily persuaded would probably be an accurate description. He didn't threaten me if I didn't, but I was afraid at the time already."

She also testified on cross-examination as follows: "Q. It is true, though . . . that you did not have unconsensual oral sex with Albert in the shower at that point; is that true? A. Correct." On redirect the prosecutor asked her "did the defendant hold you down in the shower while you were in the shower? A. He had my hair and he had his hand full of my hair and was holding me." She reiterated that she had not wanted to have oral sex and had told him so:

"A. I told him no. I didn't want to do that. I tried to stand up.

"Q. What happened when you tried to stand up?

"A. He just put pressure on my head, and he wasn't like forcefully putting a lot of pressure on me and holding me down, but he was putting enough pressure that I felt that pressure and wasn't going to push back.

"Q. Why didn't you push back and push him down?

3

"A. I did not want things to escalate, and I wanted to – wanted him to leave.  I just wanted him to go.

"Q. And at that time when he – when you told him you didn't want to, what words specifically did you say to him?

"A. No, I don't want to do this; no.

"Q. After you said: No, I don't want to do this, what did he do?

"A. He was just persuading: Come on.  Do this.  Then it was: Oh, you are going to do this.  He said: You are going to do this.  You are going to do this one last time.

"Q. And when he said that, when he said you were going to do this one last time, was he holding your head at that point?

"A. Yes.

"Q. And you said after you did – you performed oral sex on the defendant, he lifted up your leg?

"A. Yeah.

"Q. Can you describe what he did?

"A. He just grabbed my leg like underneath my knee and just lifted my leg and put it on the side of the tub."

She then testified she neither protested nor encouraged him and eventually he stopped.

The victim testified that she went to defense counsel's office "to discuss the case with you because I was concerned about the sexual charges," and when asked if she told counsel defendant had "not force[d] you to have sex in the shower" she replied "That he had not forced-forced, yes."

Later still she attempted to clarify:

"I don't know how to explain how I feel about [whether she was forced] because . . . that's not the focus of why we're here today . . . because if everything had ended after the shower, he could have walked out of my house and it would have been a done deal.

"But that's not why we're in this courtroom today.  You know, so I don't feel – no, I didn't want to do it, but I'm not going to say he forced me or he raped me either because it wasn't – I don't feel that – I don't know how to

4

explain to you how I feel about that.  I didn't want to do it,
but I was heavily coerced.  I don't feel comfortable using
the word forced, but I wasn't willing either.

"Q. Well, did you fear that he was going to hit you?

"A. I – he had already grabbed me and he had already put
his hand on me, so there was already fear there.  So, yes, I was
afraid."

She had also stated that she had never known defendant to force
himself sexually on anyone and that he did not force himself on her
"sexually speaking" that night.  However, she drew a Clintonian line
between "sex" and "oral sex."  When asked to explain statements "about
having sex in the shower" she replied "A. We didn't have sex in the
shower."  Later when she was asked to clarify whether something
happened "after you were having sex with him in the bathroom shower,"
she replied, "You keep saying after I had sex with him in the bathroom,
and no, we didn't' have sex in the bathroom.  But after, oral sex was
performed in the bathroom, the argument escalated after that."  Thus when
she testified she did not know defendant ever to force himself on anyone
and did not force himself "sexually speaking" on her that night, this is
perfectly consistent with her understanding of "sex" as opposed to "oral
sex" and her view that he coerced her into the latter, but not the former.

She also testified to having previously "stated that when you are in
a relationship, there are times your partner asks you to do things that you
may or may not want to do.  So I didn't consider it necessarily forcible, but
I didn't want to do it, and I made it clear that I didn't want to do it.  [¶] At
that point what I was doing was stating that that was not the significance
of what happened on that day.  What happened in the shower, that was not
the significance of the day.  That was the point I was trying to make with
that statement.  That's not –  Q. And that you further stated that you did
not feel that that day or that morning that he had forced himself on you; is
that true?  A. Correct.  Q. He did not force you to have oral sex with him?
A. That' correct."  She later testified that during the relationship she would
sometimes submit to sex even after saying "no."

During one round of cross-examination she testified:  "Q. Isn't it
true . . . that Albert did not force you to have sex with him, *any sex*, on
September 23rd?  A. Yes." (Italics added.)  It is not clear whether she
interpreted "any sex" to mean "any kind of sex" or that it included oral
sex, given her earlier distinction between "sex" and "oral sex."  Further,
given prior testimony, it is clear she understood the term "force" in a
special way.  On redirect she was asked about this testimony and asked to
define what she meant by "force" but at first she was not able to explain
what she meant; then she testified ". . . I was just standing there in my
clothes, and he said well, get undressed.  Aren't you going to take your
clothes off?  So he was prompting me like that and just like standing there
over me and I started crying.  [¶] So, I mean, yes, I stepped into the shower
myself with – you know, heavily prompted.  Like I said about the whole
thing, he didn't grab me and throw me in the tub, but he didn't leave me
too many options to say no either."

5

1        Defendant did not testify but introduced evidence that he had
recently been in a serious accident, reducing his ability to do the things the
2    victim described (e.g., picking her up by her hair).  He emphasized that the
victim testified she was angry with him about taking her truck and because
3    she had seen him with another woman, thereby providing a motive to lie.
He also introduced some evidence which, if believed, tended to show the
4    victim's description of events in the apartment were exaggerated and that
she had had earlier opportunities to escape.
5

6    **B.**      **Procedural History**

7        Petitioner was convicted following a jury trial of domestic abuse, assault, false

8    imprisonment, and two counts of forced oral copulation.  In a bifurcated proceeding, the trial

9    court found that petitioner had a prior conviction.  Petitioner was sentenced to a term of 35 years.

10   The conviction and sentence were affirmed by direct appeal in a reasoned opinion issued by the

11   California Court of Appeal on November 21, 2006.  The California Supreme Court denied

12   review on September 12, 2007, and the United States Supreme Court denied certiorari on

13   February 19, 2008.  Petitioner did not file any post-conviction actions in state court.  The instant

14   federal petition was filed on January 26, 2009.  Respondent concedes the petition is timely and

15   that the claims are exhausted.

16

17   **II.  STANDARDS OF REVIEW**

18       Because this action was filed after April 26, 1996, the provisions of the

19   Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively

20   applicable.  See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Calderon v. United States Dist. Ct.

21   (Beeler), 128 F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522 U.S. 1099 (1998).  The AEDPA

22   does not, however, apply in all circumstances.  When it is clear that a state court has not reached

23   the merits of a petitioner's claim, because it was not raised in state court or because the court

24   denied it on procedural grounds, the AEDPA deference scheme does not apply and a federal

25   habeas court must review the claim de novo.  See Pirtle v. Morgan, 313 F.3d 1160 (9th Cir.

26   2002) (holding that the AEDPA did not apply where Washington Supreme Court refused to reach

petitioner's claim under its "re-litigation rule"); <u>see also</u> <u>Killian v. Poole</u>, 282 F.3d 1204, 1208

(9th Cir. 2002) (holding that, where state court denied petitioner an evidentiary hearing on

perjury claim, AEDPA did not apply because evidence of the perjury was adduced only at the

evidentiary hearing in federal court); <u>Appel v. Horn</u>, 250 F.3d 203, 210 (3d Cir.2001) (reviewing

petition de novo where state court had issued a ruling on the merits of a related claim, but not the

claim alleged by petitioner). When the state court does not reach the merits of a claim,

"concerns about comity and federalism . . . do not exist." <u>Pirtle</u>, 313 F. 3d at 1167.

Where AEDPA is applicable, federal habeas relief under 28 U.S.C. § 2254(d) is

not available for any claim decided on the merits in state court proceedings unless the state

court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as determined
> by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the State
> court proceeding.

28 U.S.C. § 2254(d); <u>see also</u> <u>Penry v. Johnson</u>, 532 U.S. 782, 792-93 (2001); <u>Williams v.</u>

<u>Taylor</u>, 529 U.S. 362 (2000); <u>Lockhart v. Terhune</u>, 250 F. 3d 1223, 1229 (9th Cir. 2001). Thus,

under § 2254(d), federal habeas relief is available only where the state court's decision is

"contrary to" or represents an "unreasonable application of" clearly established law. Under both

standards, "clearly established law" means those holdings of the United States Supreme Court as

of the time of the relevant state court decision. <u>See</u> <u>Carey v. Musladin</u>, 127 S.Ct. 649, 653-54

(2006). "What matters are the holdings of the Supreme Court, not the holdings of lower federal

courts." <u>Plumlee v. Masto</u>, 512 F.3d 1204 (9th Cir. Jan. 17, 2008) (en banc). Supreme Court

precedent is not clearly established law, and therefore federal habeas relief is unavailable, unless

it "squarely addresses" an issue. <u>See</u> <u>Moses v. Payne</u>, ___ F.3d ___ (9th Cir. Sept. 15, 2008)

(citing <u>Wright v. Van Patten</u>, 128 S.Ct. 743, 746 (2008)). For federal law to be clearly

established, the Supreme Court must provide a "categorical answer" to the question before the

1  state court.  See id.; see also Carey, 127 S.Ct at 654 (holding that a state court's decision that a

2  defendant was not prejudiced by spectators' conduct at trial was not contrary to, or an

3  unreasonable application of, the Supreme Court's test for determining prejudice created by state

4  conduct at trial because the Court had never applied the test to spectators' conduct).  Circuit

5  court precedent may not be used to fill open questions in the Supreme Court's holdings.  See

6  Carey, 127 S.Ct. at 653.

7          In Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a

8  majority of the Court), the United States Supreme Court explained these different standards.  A

9  state court decision is "contrary to" Supreme Court precedent if it is opposite to that reached by

10 the Supreme Court on the same question of law, or if the state court decides the case differently

11 than the Supreme Court has on a set of materially indistinguishable facts.  See id. at 405.  A state

12 court decision is also "contrary to" established law if it applies a rule which contradicts the

13 governing law set forth in Supreme Court cases.  See id.  In sum, the petitioner must demonstrate

14 that Supreme Court precedent requires a contrary outcome because the state court applied the

15 wrong legal rules.  Thus, a state court decision applying the correct legal rule from Supreme

16 Court cases to the facts of a particular case is not reviewed under the "contrary to" standard.  See

17 id. at 406.  If a state court decision is "contrary to" clearly established law, it is reviewed to

18 determine first whether it resulted in constitutional error.  See Benn v. Lambert, 293 F.3d 1040,

19 1052 n.6 (9th Cir. 2002).  If so, the next question is whether such error was structural, in which

20 case federal habeas relief is warranted.  See id.  If the error was not structural, the final question

21 is whether the error had a substantial and injurious effect on the verdict, or was harmless.  See id.

22         State court decisions are reviewed under the far more deferential "unreasonable

23 application of" standard where it identifies the correct legal rule from Supreme Court cases, but

24 unreasonably applies the rule to the facts of a particular case.  See id.; see also Wiggins v. Smith,

25 123 S.Ct. 252 (2003).  While declining to rule on the issue, the Supreme Court in Williams,

26 suggested that federal habeas relief may be available under this standard where the state court

8

either unreasonably extends a legal principle to a new context where it should not apply, or unreasonably refuses to extend that principle to a new context where it should apply. See Williams, 529 U.S. at 408-09. The Supreme Court has, however, made it clear that a state court decision is not an "unreasonable application of" controlling law simply because it is an erroneous or incorrect application of federal law. See id. at 410; see also Lockyer v. Andrade, 123 S.Ct. 1166, 1175 (2003). An "unreasonable application of" controlling law cannot necessarily be found even where the federal habeas court concludes that the state court decision is clearly erroneous. See Lockyer, 123 S.Ct. at 1175. This is because ". . . the gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness." Id. As with state court decisions which are "contrary to" established federal law, where a state court decision is an "unreasonable application of" controlling law, federal habeas relief is nonetheless unavailable if the error was non-structural and harmless. See Benn, 283 F.3d at 1052 n.6.

The "unreasonable application of" standard also applies where the state court denies a claim without providing any reasoning whatsoever. See Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Delgado v. Lewis, 233 F.3d 976, 982 (9th Cir. 2000). Such decisions are considered adjudications on the merits and are, therefore, entitled to deference under the AEDPA. See Green v. Lambert, 288 F.3d 1081 1089 (9th Cir. 2002); Delgado, 233 F.3d at 982. The federal habeas court assumes that state court applied the correct law and analyzes whether the state court's summary denial was based on an objectively unreasonable application of that law. See Himes, 336 F.3d at 853; Delgado, 233 F.3d at 982.

/ / /

/ / /

/ / /

/ / /

/ / /

# III. DISCUSSION

Petitioner raises the following claims: (1) the evidence was insufficient to support the convictions as to Counts 4 and 5 of forcible oral copulation; (2) the trial court abused its discretion in denying petitioner's motion for a new trial based on insufficient evidence as to Counts 4 and 5; (3) the trial court erred by failing to instruct the jury that CALJIC No. 2.50.2 was limited to Counts 1 and 2; (4) counsel was ineffective for failing to request an appropriate modification to CALJIC No. 2.50.2; (5) the trial court erred by failing to instruct the jury pursuant to CALJIC No. 10.65; (6) counsel was ineffective for failing to request an instruction under CALJIC No. 10.65; (7) the trial court erred by instructing the jury pursuant to CALJIC No. 1.23 regarding consent; (8) the trial court erred in denying petitioner's motion to strike a prior conviction; (9) counsel was ineffective with respect to the motion to strike a prior conviction; and (10) consecutive sentences were improperly imposed based on facts determined by the trial judge and not the jury.[2]

## A. Sufficiency of the Evidence Claims

Petitioner argues:

> In the present case, the evidence was insufficient to demonstrate the subject incidents of oral copulation [Counts 4 and 5] were accomplished by means of "force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person" under [California Penal Code] section 288a. Without question, the victim testified she was not forced by Petitioner into the acts of oral copulation. Nor was there evidence that the acts of oral copulation were accomplished by violence, given the fact that Petitioner was not violent with [the victim] in the shower.

Petitioner also argues that the trial court abused its discretion in denying his motion for a new trial on Counts 4 and 5 based on insufficient evidence. Specifically, petitioner contends that, rather than analyzing whether the evidence was sufficient, "the court was obligated to evaluate the weight of all the evidence anew, and not to uncritically accept the prosecution's evidence

---

[2] In presenting these claims, petitioner attaches to his federal petition the brief filed in support of his petition for review to the California Supreme Court.

while viewing it in a light most favorable to the verdict."

When a challenge is brought alleging insufficient evidence, federal habeas corpus relief is available if it is found that, upon the record of evidence adduced at trial, viewed in the light most favorable to the prosecution, no rational trier of fact could have found proof of guilt beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979).[3] Under Jackson, the court must review the entire record when the sufficiency of the evidence is challenged on habeas. See id. It is the province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Id. "The question is not whether we are personally convinced beyond a reasonable doubt. It is whether rational jurors could reach the conclusion that these jurors reached." Roehler v. Borg, 945 F.2d 303, 306 (9th Cir. 1991); see also Herrera v. Collins, 506 U.S. 390, 401-02 (1993). The federal habeas court determines sufficiency of the evidence in the context of the substantive elements of the criminal offense, as defined by state law. See Jackson, 443 U.S. at 324 n.16.

Regarding the sufficiency of the evidence, the California Court of Appeal stated:

> Defendant contends no substantial evidence supports the oral copulation convictions because there was no evidence of force. He raises this alternatively as a claim that the trial court improperly denied his motions for a directed verdict (citation omitted) and for a new trial, both of which challenged the sufficiency of the evidence. Defendant asserts, "Without question, the victim testified she was not forced by Appellant into the acts of oral copulation. [Citations]. Nor was there evidence that the acts of oral copulation were accomplished by violence, given the fact that Appellant was not violent with [the victim] in the shower. [¶] The question then becomes, was the evidence sufficient to show the acts were accomplished by means of duress, menace, or fear of immediate and unlawful bodily injury?"

---

[3]      Even though Jackson was decided before AEDPA's effective date, this expression of the law is valid under AEDPA's standard of federal habeas corpus review. A state court decision denying relief in the face of a record establishing that no rational jury could have found proof of guilt beyond a reasonable doubt would be either contrary to or an unreasonable application of the law as outlined in Jackson. Cf. Bruce v. Terhune, 376 F.3d 950, 959 (9th Cir. 2004) (denying habeas relief on sufficiency of the evidence claim under AEDPA standard of review because a rational jury could make the finding at issue).

Defendant's recitation of the facts improperly skews them in the light most favorable to his claim and improperly segments the events into discrete periods which, in his view, bear no relationship to each other. In fact, when we view the events in their totality, and in the light most favorable to the verdict, as we are obligated to do (citation omitted), we find substantial evidence to support the verdicts.

The state court then outlined California law on forced oral copulation, noting that California Penal Code § 288a(c)(2) provides: "Any person who commits an act of oral copulation when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person shall be punished by imprisonment in the state prison. . . ." The court continued as follows:

. . . [H]ere defendant accomplished the first act of oral sex by entering [the victim's] house in the early morning, threatening her housemates, locking the victim in a bathroom, ignoring her "no" response, and by holding her hair and pushing [her head] onto his penis. He then physically moved her leg aside so he could perform oral sex [on the victim]. The "force associated" with the former act, coupled with "all the circumstances" show that the latter was accomplished by duress. (citation omitted).

The court then noted that, under California law, the force required in adult sexual crime cases is only that force which is necessary to overcome the victim's will, not more force than is necessary to accomplish the act. The term "force," as used an § 288a(c)(2), "simply plumbs the line between consensual and non-consensual adult sexual activity." People v. Guido, 125 Cal.App. 4th 566, 576 (3rd. Dist. 2005).

As to the victim's statements to police in this case, the court stated:

We note in particular that the victim's prior statements to two police officers, to the effect that defendant "made" or "forced" her to have sex were highly significant. (citation to record omitted). By omitting any mention of this evidence in his briefs, defendant has failed in his duty to paint the evidence faithfully. (citation omitted). In any event, the victim's testimony taken as a whole supports the jury's verdicts. To briefly recap, the victim had broken up with defendant *and sought a restraining order against him after he assaulted her on two occasions.* She woke up *at 3 a.m. to find him in her bedroom.* When she refused to take a shower with him *he became angry and grabbed her arm.* He ignored her refusals and *he pushed her against a wall and threatened to "fuck everybody up in the*

*house" if she made noise. He locked her in the bathroom.* After she was
in the shower *he ignored her refusals and pushed her head onto his penis.*
When this act finished defendant physically moved her leg and began an
act of oral copulation.

The court then stated that the evidence of events after these sex acts "circumstantially bolster the

lack of consent." The court stated:

> . . . Here, after the oral sex the victim fled the bathroom to seek
> help; after being urged so to do by her housemates, the victim left with
> defendant but ultimately fled from him once he fell asleep, whereupon she
> ran from the house to the high school to get help; once an officer found her
> she was screaming and still very scared.

Finally, the state court addressed petitioner's related argument that the trial court erred in denying

his motion for a new trial based on insufficient evidence of forced oral copulation:

> To the extent defendant separately contends the trial court
> misapplied the law in denying his new trial motions, the claim is based on
> an overly-fine reading of the trial court's ruling. The trial court stated:
> "Well, there was evidence presented at the time of the trial that, in fact it
> [oral copulation] did occur and that the – there was certainly sufficient
> evidence for the jury to have concluded that even with the impeachment,
> and that's really a province of the jury, and it is not clear enough that this
> Court would overstep the decision of the jury in that case." Later the court
> stated there was "clearly sufficient evidence to sustain" the verdicts.
>
> * * *
>
> Although, as the Attorney General concedes, the trial court's
> language was "less than artful," we do not read the record to indicate the
> trial court misunderstood its duty regarding the new trial motion. (citation
> omitted). Further, in the unlikely event that this experienced trial judge
> actually misunderstood the scope of its discretion on the new trial motion,
> given the trial court's comments and the strength of the evidence, any error
> by the trial court was harmless. (citation omitted).

Relying largely on the victim's testimony, petitioner argues that there was no

evidence of use of force, violence, fear, or duress. Viewing the facts in the light most favorable

to the prosecution, as this court must, See Jackson, 443 U.S. at 319, the court cannot agree with

petitioner. The following facts were adduced at trial with respect to the forced oral copulation

charged in Counts 4 and 5: (1) the victim sought a restraining order against petitioner after he had

assaulted her on September 1, 2002, and September 19, 2002; (2) the victim woke up at 3:00

13

a.m. on September 23, 2002, to find petitioner, uninvited, in her bedroom standing over her; (3) at this point, the victim was scared; (4) after petitioner told the victim to go to the shower, he became angry and grabbed her; (5) after the victim said she didn't want to go to the shower, petitioner pushed her against the wall; (6) petitioner then told the victim not to make any noise or he would "fuck everybody up"; (7) at this point, petitioner was angry and the victim was afraid; (8) petitioner had a hold of the victim, who was reluctant to go with him; (9) the victim asked that the bathroom door be left open, but petitioner instead shut the door and locked it; (10) the victim reluctantly got into the shower and petitioner ordered her to perform oral sex on him; (11) petitioner had his hand on the victim's head, held a handful of her hair, and pushed her head onto his penis; (12) the victim had told petitioner she did not want to perform oral sex on him; and (13) following the first act of oral sex, petitioner moved the victim's leg and he performed unwanted oral sex on her.

As to the first act of oral copulation, there was ample evidence to satisfy the elements of the crime. Specifically, petitioner used force by grabbing the victim, pushing her against the wall, locking the bathroom door, holding her head and hair, and pushing her head onto his penis. These facts not only contradict petitioner's assertion that he was not violent with the victim in the shower, they show that he was violent beforehand. Further, petitioner's uninvited presence in the victim's bedroom, with petitioner standing over the victim's bed, was certainly menacing, especially in light of petitioner's two recent assaults on the victim. Petitioner also threatened to "fuck everybody up" who was in the house if the victim made any noise, satisfying the elements of duress and/or fear of imminent bodily injury to another.

To the extent the victim testified that she was not forced to perform oral sex on petitioner, such testimony was contradicted by other statements made by the victim. The victim told the school police officer that petitioner made her perform oral sex on him. She told another officer that petitioner forced her to perform oral sex. The victim also told an investigator that she had said "no" when petitioner demanded oral sex and that she had been "heavily coerced." It is

14

obvious the jury chose not to assign any weight to the victim's in-court testimony that she had not been forced. It is not for this court to question the weight the jury gave to particular evidence.

In light of the foregoing facts, and coupled with the victim's statements that she was afraid, heavily coerced, and wasn't a willing participant, any reasonable jury could have concluded that petitioner used force, menace, duress, and/or fear in accomplishing the first act of forced oral copulation.

As to the second act, the evidence shows that petitioner used some amount of physical force by moving the victim's leg and performing unwanted oral sex on her. Coupled with the facts leading to the first act – defendant's uninvited presence in the victim's bedroom at 3:00 a.m., petitioner's threats against the victim's housemates, petitioner's use of force to get the victim to the bathroom, the locked bathroom door, the victim's obvious reluctance – a reasonable jury could have concluded from the amount of physical force used to accomplish the second act that the elements of forced oral copulation had been satisfied as to the second act as well. Even ignoring petitioner's use of physical force to lift the victim's leg in order to accomplish the second act, nothing had occurred immediately following the first act to reduce the menace, threat, or fear. The door was still locked. The threat against the victim's housemates if she made any noise was still real. And petitioner's presence was still uninvited and his actions unwanted. On this record, and viewing the facts in the light most favorable to the prosecution, this court cannot say that the evidence was insufficient to allow a reasonable jury to conclude that the elements of the statute had been established as to the second act of forced oral copulation.

Turning to petitioner's related argument that the trial court applied the wrong standard in denying his motion for a new trial as to Counts 4 and 5 based on insufficient evidence, this court finds that, regardless of whether the trial court applied the correct standard or not, and regardless of whether it could have used more artful language in denying the motion, any error was harmless. Specifically, as discussed above, the evidence was clearly sufficient to allow

a reasonable jury to conclude that petitioner committed the crimes charged in Counts 4 and 5. There would have been no basis upon which to grant a new trial on Counts 4 and 5 because, acting as a "13th juror." see People v. Lagunas, 8 Cal.4th 1030, 1038, n.6 (1994), the trial court correctly concluded that there was "sufficient credible evidence to support the verdict," see People v. Robarge, 41 Cal.2d 628, 633 (1953).

For all the foregoing reasons, the court finds that the state court's denial of these related claims was neither contrary to nor an unreasonable application of clearly established law.

## B.     Jury Instruction Claims

Petitioner raises three arguments concerning jury instructions. First, petitioner claims that the trial court erred by failing to instruct the jury that CALJIC No. 2.50.2 – regarding prior acts of domestic violence – was limited to Counts 1 and 2 and had no application to Counts 4 and 5. Second, petitioner asserts that the trial court erred by failing to instruct the jury pursuant to CALJIC No. 10.65 regarding his reasonable and good faith belief that the victim consented to the acts of oral copulation alleged in Counts 4 and 5. Third, petitioner argues that the trial court erred by instructing the jury on the definition of "consent" pursuant to CALJIC No. 1.23 instead of CALJIC No. 1.23.1.

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of a transgression of federal law binding on the state courts. See Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983). It is not available for alleged error in the interpretation or application of state law. See Middleton, 768 F.2d at 1085; see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986). Habeas corpus cannot be utilized to try state issues de novo. See Milton v. Wainwright, 407 U.S. 371, 377 (1972). Thus, a challenge to jury instructions does not generally give rise to a federal constitutional claim. See Middleton, 768 F.2d at 1085) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)).

However, a "claim of error based upon a right not specifically guaranteed by the Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so infects the entire trial that the resulting conviction violates the defendant's right to due process." Hines v. Enomoto, 658 F.2d 667, 673 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th Cir. 1980)); see also Lisenba v. California, 314 U.S. 219, 236 (1941). In order to raise such a claim in a federal habeas corpus petition, the "error alleged must have resulted in a complete miscarriage of justice." Hill v. United States, 368 U.S. 424, 428 (1962); Crisafi v. Oliver, 396 F.2d 293, 294-95 (9th Cir. 1968); Chavez v. Dickson, 280 F.2d 727, 736 (9th Cir. 1960).

In general, to warrant federal habeas relief, a challenged jury instruction "cannot be merely 'undesirable, erroneous, or even "universally condemned,"' but must violate some due process right guaranteed by the fourteenth amendment." Prantil v. California, 843 F.2d 314, 317 (9th Cir. 1988) (quoting Cupp v. Naughten, 414 U.S. 141, 146 (1973)). To prevail, petitioner must demonstrate that an erroneous instruction "'so infected the entire trial that the resulting conviction violates due process.'" Estelle v. McGuire, 502 U.S. 62, 72 (1991) (quoting Cupp, 414 U.S. at 147). In making its determination, this court must evaluate an allegedly ambiguous jury instruction "'in the context of the overall charge to the jury as a component of the entire trial process.'" Prantil, 843 F.2d at 817 (quoting Bashor v. Risley, 730 F.2d 1228, 1239 (9th Cir. 1984)). Further, in reviewing an allegedly ambiguous instruction, the court "must inquire 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." Estelle, 502 U.S. at 72 (quoting Boyde v. California, 494 U.S. 370, 380 (1990)). Petitioner's burden is "especially heavy" when the court fails to give an instruction. Henderson v. Kibbe, 431 U.S. 145, 155 (1977). Where an instruction is missing a necessary element completely, the "reasonable likelihood" standard does not apply and the court may not ". . . assume that the jurors inferred the missing element from their general experience or from other instructions. . . ." See Wade v. Calderon, 29 F.3d 1312, 1321 (9th Cir. 1994). In the case of an instruction which omits a necessary element, constitutional error has occurred. See id.

17

It is well-established that the burden is on the prosecution to prove each and every element of the crime charged beyond a reasonable doubt. See In re Winship, 397 U.S. 358, 364 (1970). Therefore, due process is violated by jury instructions which use mandatory presumptions to relieve the prosecution's burden of proof on any element of the crime charged. See Francis v. Franklin, 471 U.S. 307, 314 (1985); see also Sandstrom v. Montana, 442 U.S. 510 (1979). A mandatory presumption is one that instructs the jury that it must infer the presumed fact if certain predicate facts are proved. See Francis, 471 U.S. at 314. On the other hand, a permissive presumption allows, but does not require, the trier of fact to infer an elemental fact from proof of a basic fact. See County Court of Ulster County v. Allen, 442 U.S. 140, 157 (1979). The ultimate test of the constitutionality of any presumption remains constant – the instruction must not undermine the factfinder's responsibility at trial, based on evidence adduced by the government, to find the ultimate facts beyond a reasonable doubt. See id. at 156 (citing In re Winship, 397 U.S. at 364).

Even if there is constitutional error, non-structural errors may be harmless. See Hedgpeth v. Pulido, 129 S.Ct. 530, 532 (2008) (per curiam) (citing Chapman v. California, 386 U.S. 18 (1967)). In the context of jury instructions, an error is not structural so long as the error does not "vitiat[e] all the jury's findings." Sullivan v. Louisiana, 508 U.S. 275, 2781 (1993) (holding that an erroneous reasonable doubt instruction resulted in structural error not subject to harmless error analysis). An instructional error which resulted in omission of an element of the offense was a trial error subject to harmless error review. See Hedgpeth, 129 S.Ct. at 532 (citing Neder v. United States, 527 U.S. 1 (1999)). An erroneous aider and abettor instruction is also not structural. See id. (citing California v. Roy, 519 U.S. 2 (1996) (per curiam)). A jury instruction which misstates an element of an offense is also not structural. See id. (citing Pope v. Illinois, 481 U.S. 497 (1987)). An erroneous burden-shifting instruction is also not structural. See id. (citing Rose v. Clark, 478 U.S. 570 (1986)). Finally, an instruction on multiple theories of guilt where one of the theories is improper does not result in a structural error requiring automatic

reversal but is error subject to harmless error analysis.  See id.

In Chapman, a case before the Supreme Court on direct review, the Court held that "before a [non-structural] constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."  386 U.S. at 24.  A different harmless error standard applies to cases on collateral review.  In Brecht v. Abrahamson, the Court stated that applying the Chapman standard on collateral review "undermines the States' interest in finality and infringes upon their sovereignty over criminal matters."  507 U.S. 616, 637.  The Court also noted that the Chapman standard is at odds with the historic meaning of habeas corpus – which is meant to afford relief only to those who have been grievously wronged – because it would require relief where there is only a reasonable possibility that a constitutional error contributed to the verdict.  See id.  Therefore, in habeas cases, the standard applied in Kotteakos v. United States, 328 U.S. 750 (1946), governs harmless error analysis for non-structural constitutional errors.  See Brecht, 507 U.S. at 637.  Under this standard, relief is available where non-structural error occurs only where such error "had a substantial and injurious effect or influence in determining the jury's verdict."  Kotteakos, 328 U.S. at 776.

1.    CALJIC No. 2.50.2

The trial court allowed the prosecution to introduce evidence of specific acts of prior domestic abuse to show petitioner's propensity to commit such acts, and gave the jury a limiting instruction under CALJIC No. 2.50.2 on the use of such evidence.  As to petitioner's claim, the California Court of Appeal stated:

> . . . Defendant contends the trial court misinstructed on the scope of permissible use of the prior act evidence.  He asserts the trial court instructed that prior acts could be used to show his guilt of *all* the instant "offenses," but defendant points out that not all of the instant offenses involved domestic abuse as defined by statute.  He concedes the instruction was proper as to Count I (domestic abuse) and Count II (assault with a deadly weapon), but asserts it should not have applied to Count III (kidnapping) or Counts IV and V (forcible oral copulation).
>
> For purposes of this appeal we agree with defendant that the prior act evidence was not admissible as to Counts III-V . . ., but we do not believe the instruction given would be interpreted by the jury in the way

19

defendant suggests, nor do we believe, based on the record of this case, that any prejudice ensued even if the instruction was so interpreted.

* * *

As stated, defendant asserts the instruction – absent modification, which he failed to request – could have led the jury to conclude he was guilty of offenses other than the domestic abuse charged in Count I and the assault charged in Count II. We disagree.

The instruction as given told the jury it "may . . . infer that defendant had a disposition to commit *other offenses involving domestic violence*," and domestic violence was defined as "abuse" in a specified relationship, further defined as "intentionally or recklessly causing or attempting to cause bodily injury[.]" Thus, by its terms the instruction limited the permissible use of the evidence to and only to "offense[s] involving domestic violence" as defined. It would not allow the use of the evidence as to the kidnapping and oral copulation charges. True, it also states, "If you find that the defendant has this disposition, you may, but are not required to infer that he was likely to commit and did commit *the crime of which he is accused*." (Italics added [by Court of Appeal]). But in the context of the instruction as a whole, it is not reasonable to conclude the jury would interpret this sentence to mean the evidence was relevant to all crimes "of which he is accused" whether or not they involved domestic abuse.

The Court of Appeal went on to conclude that, even assuming the instruction should have been modified, the instruction as given did not relieve the prosecution of its burden of proof on any essential element. The court stated: "At worst, it allowed a permissive inference to be applied to the wrong counts. . . ."

The instruction told the jury that it could consider prior acts of domestic violence to show that defendant had the disposition to commit other acts of domestic violence. By this plain language of the instruction as given, the jury's consideration of evidence of prior acts of domestic violence was limited to the current charges of domestic violence in Counts 1 and 2. The jury could not have reasonably believed that evidence of prior domestic violence had any bearing on the charges in the other counts (kidnapping and forced oral copulation), which did not relate to domestic violence in any way. Moreover, the court agrees with the Court of Appeal's conclusion that, at worst, the instruction allowed the jury to make a permissive inference as to the wrong counts. Specifically, the instruction provided that the jury "may . . . infer" and did not

20

require any particular inference based on evidence of prior bad acts.  Because the instruction as given did not create any improper mandatory inference, it did not relieve the prosecution's burden of proof on any essential element.  For these reasons, the state court's denial of this claim was neither contrary to nor an unreasonable application of clearly established law.

## 2.    CALJIC No. 10.65

Petitioner contends that the trial court should have instructed under CALJIC No. 10.65 that the jury was required to acquit him of the sex offenses if petitioner had a reasonable belief that the victim consented to the acts.  The Court of Appeal characterized this argument as "a form of mistake-of-fact defense" under People v. Mayberry, 15 Cal.3d 143 (1975).  As to this claim, the court stated:

> Despite contrary language in some cases, we recently explained that instructions on a defense must be given if and only if substantial evidence supports it.  (citation omitted).
> To require a *Mayberry* instruction there must be substantial evidence of a defendant's "reasonable and good faith belief" that the alleged victim "voluntarily consented" to the sexual activity; however, "a belief that is based upon ambiguous conduct by an alleged victim that is the product of conduct by the defendant that amounts to force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person of the alleged victim or another is not a reasonable good faith belief."  (citations omitted).  Assertion of the defense is successful if the defendant raises a reasonable doubt on the issue of his intent.  (citation omitted).
> "[R]egardless of how strongly a defendant may subjectively believe a person has consented to sexual intercourse, that belief must be formed under circumstances society will tolerate as reasonable in order for the defendant to have adduced substantial evidence giving rise to a *Mayberry* instruction."  (citation omitted).  Defendant intruded into the victim's house early in the morning, threatened her housemates to keep her quiet, and pulled her towards the bathroom where he demanded oral sex, ignored her refusal and pushed on her head to accomplish the first act; later, he physically moved her leg to accomplish the second act.  Our society does not tolerate such conduct as reasonable.  (citation omitted).

The Court of Appeal also concluded that the failure to give a Mayberry instruction under CALJIC No. 10.65 was harmless:

> Further . . . nothing in the *Mayberry* instruction would have changed the substantive definitions of consent, force and duress, and under those instructions the jury found beyond a reasonable doubt that defendant

acted by coercing the victim. This negates an innocent misunderstanding. Put another way, had a *Mayberry* instruction been given, the jury would have followed the proviso that the defense is not available where a defendant acts on a victim's ambiguous conduct in response to threats. (citation omitted). Therefore, the *Mayberry* instruction would have made no difference and any error was harmless.

This court agrees with the state court that petitioner could not have formed a reasonable or good faith belief that the victim consented to his sexual conduct. Specifically, as discussed above, petitioner's presence in her house at 3:00 a.m. was uninvited, the victim was grabbed and pushed into the bathroom, the bathroom door was locked against the victim's wishes, the victim's head was pushed down onto petitioner's penis, and both acts of oral copulation were unwanted. The victim testified that, even though she did not consider the acts of oral copulation to have been forced, she was nonetheless afraid and felt coerced.

The events after the acts of oral copulation also indicate that the victim did not consent and that any subjective belief that petitioner may have had that she did consent was unreasonable. The record reflects that, after the incidents in the shower, the victim was afraid that petitioner was going to hit her and she fled the bathroom and pounded on a roommate's door. Petitioner and the victim then struggled and petitioner hit the victim in the face and picked her up by her hair. Petitioner also cut the victim with a steak knife. After petitioner and the victim left the apartment, petitioner told her that he had dug a ditch and was going to put the victim in it. After that, petitioner hit the victim hard enough to blur her vision for several minutes. These facts are not indicative of any consent on the part of the victim. To the contrary, had the victim actually consented to the sexual acts in the bathroom, petitioner would have had no reason to resort to the violence that ensued. As the state court observed, these additional facts "circumstantially bolster the lack of consent."

/ / /

/ / /

/ / /

Based on this record, there would have been no basis for a <u>Mayberry</u> instruction pursuant to CALJIC No. 10.65. Even had such an instruction been given, the instruction would have made no difference to the outcome because any subjective belief on the part of petitioner that the victim consented would have been unreasonable. Therefore, the court finds that the state court's denial of this claim was neither contrary to nor an unreasonable application of clearly established law.

3.   <u>CALJIC No. 1.23</u>

Petitioner claims the trial court misinstructed the jury on the term "consent" when it gave CALJIC No. 1.23. The Court of Appeal agreed, but found the error harmless. The court stated:

> The trial court instructed the jury pursuant to CALJIC No. 1.23 as follows:
>
> > "To consent to an act or transaction, a person (1) must act freely and voluntarily and not under the influence of threats, force or duress; (2) must have knowledge of the true nature of the act or transaction involved; and (3) must possess the mental capacity to make an intelligent choice whether or not to do something proposed by another person.
> >
> > "Merely being passive does not amount to consent. Consent requires a free will and positive cooperation in act or attitude."
>
> Unfortunately, "This instruction should not be given in connection with a prosecution for. . ." . . . forcible oral copulation. (citation omitted). As to the oral copulation counts the trial court should have instructed the jury pursuant to CALJIC No. 1.23.1 as follows:
>
> > "[T]he word 'consent' means positive cooperation in an act or attitude as an exercise of free will. The person must act freely and voluntarily and have knowledge of the nature of the act or transaction involved."
>
> In denying defendant's new trial motion raising this error, the trial court acknowledged there were minor differences between the instructions, but concluded none of the differences caused prejudice. We agree with the trial court. A close comparison reveals there is very little substantive difference between these instructions.

The first paragraph of CALJIC No. 1.23 states that a person must be free of duress and have the mental capacity and knowledge to understand the request being made, similar to a portion of CALJIC No. 1.23.1. Defendant does not argue with this proposition of law.

The second paragraph of CALJIC No. 1.23 contains two sentences: "Merely being passive does not amount to consent. Consent requires a free will and positive cooperation in act or attitude." CALJIC No. 1.23.1 embraces the latter sentence by stating that consent "means positive cooperation . . . as an exercise of free will." Thus, it is only the first sentence of the second paragraph which is materially different. However, this difference is more apparent than real. Although CALJIC No. 1.23.1 does not address passivity by use of such term, passivity in this context reflects the opposite of "a free will and positive cooperation" as stated in CALJIC No. 1.23, or "positive cooperation . . . as an exercise of free will" as stated in CALJIC No. 1.23.1.

Defendant asserts the statement that "merely being passive does not amount to consent" creates a presumption requiring the defendant to prove "either active cooperation or his reasonable, good-faith belief in such cooperation," thereby lessening the People's burden of proof and improperly shifting the burden of proof to defendant. We disagree.

As stated, the line about passivity is immediately followed by a description of its opposite, namely, that "Consent requires a free will and positive cooperation in act or attitude." Further, the jury was instructed that the People bore the burden to prove *lack of consent* beyond a reasonable doubt. The addition of the statement that "merely being passive does not amount to consent" did not change the definition of what *does* amount to consent, *viz.*, free will and positive cooperation. The "passive" language did not create any mandatory presumption, not did it alter the burden of proof. Therefore any error is a state-law error, and we find any such error to be harmless. (citation omitted).

The essence of petitioner's argument is that, by instructing the jury under CALJIC No. 1.23 instead of CALJIC No. 1.23.1, it improperly shifted the burden of proof regarding the victim's consent or lack thereof. The court finds the difference between the two instructions to be almost imperceptible in that both make clear that consent requires an exercise of free will and positive cooperation in act or attitude. As discussed above, it is clear the victim demonstrated neither in this case with respect to the acts of forced oral copulation. Further, as the Court of Appeal noted, the trial court separately and correctly instructed the jury that the prosecution bore the burden of proving beyond a reasonable doubt that the victim did not consent. In light of the entire charge to the jury, the jury could not have misunderstood the proper burdens of proof and this court finds that any error of state law resulting from the trial court's reading of CALJIC No.

24

1.23 was harmless.  Therefore, the state court's denial of this claim was neither contrary to nor an

unreasonable application of clearly established law.

C.    **Motion to Strike Prior Conviction**

Petitioner argues: (1) the trial court erred by not actually ruling on his motion to

strike a prior conviction; and (2) the imposition of an aggravated sentence based on the prior

conviction "produced an arbitrary, capricious, and/or patently absurd result in light of the specific

facts of this case."  The Court of Appeal outlined the relevant procedural background as follows:

> After the verdicts the trial court appointed a new attorney to bring a
> new trial motion on defendant's behalf.  Defendant personally filed a [pro
> se] *Romero* motion . . . to have the court strike the prior conviction.  The
> trial court later emphasized that defendant had to decide whether to
> represent himself or keep the services of his lawyer. . . .  At that point,
> defendant states he wanted trial counsel to represent him again, and the
> trial court so ordered.
>       Later, trial counsel filed a "superceding [sic]" sentencing
> memorandum *which did not raise Romero issues*.
>
>                                     * * *
>
>       The trial court then sentenced defendant, imposing the *midterm* on
> the principal count. . . .

The Court of Appeal addressed the merits of the <u>Romero</u> motion to strike and did not decide

whether the motion had been withdrawn by counsel.  In determining that a <u>Romero</u> motion

would not have had merit, the court stated:

> A trial court has discretion to strike a prior in the furtherance of
> justice.  (citation omitted).  "[I]n ruling whether to strike or vacate a prior
> serious and/or violent felony conviction allegation or finding under the
> Three Strikes law, on its own motion, 'in furtherance of justice' pursuant
> to Penal Code section 1385(a), or in reviewing such a ruling, the court in
> question must consider whether, in light of the nature and circumstances of
> his present felonies and prior serious and/or violent felony convictions,
> and the particular of his background, character, and prospects, the
> defendant may be deemed outside the [Three Strikes law] scheme's spirit,
> in whole or in part, and hence should be treated as though he had not
> previously been convicted of one or more serious and/or violent felonies."
> (citation omitted).
>       At sentencing the trial court considered a detailed probation report.
> Defendant lodged no objections to the report.  Therefore, he has forfeited
> any claim that the information therein is not accurate.  (citation omitted).

The report reflects that defendant was born in 1976.  In 1990 he was made a ward for receiving stolen property, based on being found in a stolen car.  Later in 1990 he committed a robbery when he was interrupted stealing speakers from a car, and tried to cut the car's owner with a knife.  While he was detained as a ward, he escaped and committed another robbery with a firearm; during a court proceeding, he "attempted to escape from court, knocking an official to the ground."  He later ran away from the Boys Ranch and burgled an occupied residence.  He performed poorly during his wardship by these acts and also by "submitting a dirty urine test."

In 1994 defendant and a juvenile forced the door of a residence and defendant pointed a gun at the occupant; he was convicted in 1995 of residential burglary and sent to prison for five years.  After he was paroled, he was returned to custody *seven* times, and was discharged in October 2001.  In February 2002 he choked and punched his other girlfriend (Crystal) and threatened to kill her, all in the presence of Crystal's daughter.  On May 24, 2002, he was convicted of misdemeanor domestic abuse and placed on three years probation – just four months before the instant crimes against his longer-term girlfriend.

Defendant has no substantial employment experience or skills and he is an admitted member of the Varrio North Side gang.  During these proceedings, he twice violated jail rules, resulting in lockdowns.

Based on this record, there is no basis upon which the trial court could have stricken the prior conviction, as defendant is a veritable poster child for application of the Three Strikes law: He has committed many crimes, beginning at an early age; these include violence and use of weapons.  He has demonstrated contempt for the system by escaping or attempting to escape, attacking a court official, violating parole, and violating jail rules.  He committed the instant crimes while on probation.  He was placed on probation for assaulting a girlfriend (Crystal) shortly after termination of his state prison sentence.  Although he asserts the oral copulation offenses were minor because the victim did not think they were serious, her belief is not dispositive and defendant's record reflects no mitigating circumstances.  He presents as a defendant who will likely reoffend, exactly the kind of defendant targeted by the Three Strikes law. (citation omitted).  Defendant is the type of "revolving door" criminal addressed by the Three Strikes law and therefore its application to his case cannot be deemed outside its letter and spirit.

The Court of Appeal concluded that it would have been an abuse of the trial court's discretion to grant a <u>Romero</u> motion in this case.

Initially, it seems clear that there was no <u>Romero</u> motion properly pending before the trial court.  The original motion was filed by petitioner pro se.  After petitioner clearly expressed his desire to be represented by counsel, and after that request was granted by the trial court, petitioner's counsel did not raise any <u>Romero</u> argument in his sentencing memorandum.

26

Assuming, however, that the trial court erred by failing to rule on petitioner's pro se <u>Romero</u> motion, the court finds that any error was harmless because, had the motion been considered, it would have been denied. As the Court of Appeal noted, petitioner is a "poster child" for application of California's recidivist offender statute. Petitioner's criminal history is long, going back to his early teens. He committed violent and/or serious crimes in 1990, 1994, 1995, and 2002. Some of these crimes were committed while on probation. On this record, it simply cannot be said that enhancement of petitioner's sentence based on the prior conviction violated either the letter or spirit of California's recidivist offender law. The court finds that the state court's denial of this claim was neither contrary to nor an unreasonable application of clearly established law.

### D. Ineffective Assistance of Counsel Claims

Petitioner raises three claims of ineffective assistance of counsel which are related to arguments discussed above. First, petitioner argues that trial counsel was ineffective for failing to request an appropriate modification to CALJIC No. 2.50.2. Second, petitioner asserts that trial counsel was ineffective for failing to request an instruction pursuant to CALJIC No. 10.65. Third, petitioner claims that trial counsel was ineffective with respect to his <u>Romero</u> motion to strike the prior conviction.

The Sixth Amendment guarantees the effective assistance of counsel. The United States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). First, a petitioner must show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. <u>See id.</u> at 688. To this end, petitioner must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment. <u>See id.</u> at 690. The federal court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance. <u>See id.</u> In making this determination, however, there is a strong presumption "that counsel's conduct was within the

wide range of reasonable assistance, and that he exercised acceptable professional judgment in all significant decisions made." Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).

Second, a petitioner must affirmatively prove prejudice. See Strickland, 466 U.S. at 693. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id.; see also Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000). A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697).

With respect to counsel's failure to request modification of CALJIC No. 2.50.2, there could have been no prejudice to petitioner because, as discussed above, either no modification was necessary or the unmodified instruction did not create any improper mandatory inference. Similarly, as to counsel's failure to request that the jury be instructed pursuant to CALJIC No. 10.65, there could have been no prejudice because either there was no evidentiary basis for a Mayberry instruction or, had such an instruction been given, the defense would have been rejected. Finally, as to the Romero issue, such a motion would have been meritless and, for this reason, the court cannot say that counsel's performance was deficient for failing to raise the issue in his sentencing memorandum. For these reasons, the state court's denial of petitioner's claims of ineffective assistance of counsel was neither contrary to nor an unreasonable application of clearly established law.

### E. Consecutive Sentences

Petitioner argues that the imposition of "full and consecutive terms" on Counts 4

1  and 5 violated the rule of Apprendi v. New Jersey, 530 U.S. 466 (2000), and its progeny.

2  Specifically, he claims:

3        The trial court's imposition of an aggravated sentence as to Counts
          4 and 5, based upon its own judicial factfinding, violated Petitioner's
4         constitutional rights to due process and a jury trial under the 5th, 6th, and
          14th Amendments to the United Sates Constitution, and parallel California
5         constitutional provisions. (citation omitted). Under the rationales of
          [Apprendi and its progeny], the fact that Petitioner's convictions may have
6         been "numerous" and "of increasing seriousness" was subject to the
          federal constitution's burden of proof beyond a reasonable doubt and
7         should have been submitted to a jury.

8  The Court of Appeal did not address this claim other than to note that it had been rejected by the

9  California Supreme Court in People v. Black, 35 Cal.4th 1238 (2005), and that petitioner

10 preserved the issue for future appeal.

11        In Oregon v. Ice, the Supreme Court held that the rule of Apprendi and its progeny

12 does not prohibit states from assigning to judges, rather than juries, the task of finding facts

13 necessary to impose consecutive sentences for multiple offenses. See 129 S.Ct. 711, 718 (2009).

14 Therefore, the state court's tacit rejection of this claim was neither contrary to nor an

15 unreasonable application of any clearly established Supreme Court precedent.

16

17                                **IV. CONCLUSION**

18        Accordingly, IT IS HEREBY ORDERED that:

19        1.    Petitioner's petition for a writ of habeas corpus (Doc. 1) be denied; and

20        2.    The Clerk of the Court be directed to enter judgment and close this file.

21

22 DATED: May 7, 2009

23                                _____

24                                **CRAIG M. KELLISON**
                                  UNITED STATES MAGISTRATE JUDGE

25

26